**CUBAN ATLANTIC SUGAR SALES CORPORATION, Libelant,**

v.

**The MARINE MIDLAND TRUST COMPANY OF NEW YORK and Ocean Trading Corporation, Respondents.**

**Ad. No. 194-218.**

United States District Court
S. D. New York.

Aug. 1, 1962.

See also 169 F.Supp. 806.

Kirlin, Campbell & Keating, New York City, for libelant, Clement C. Rinehart, Walter P. Hickey, New York City, of counsel.

Sullivan & Cromwell, New York City, for respondent, Marine Midland Trust Co. of New York, Edward C. Stebbins, Jr., New York City, of counsel.

WEINFELD, District Judge.

The libelant seeks to recover $84,247.-56 which it paid to the respondent The Marine Midland Trust Company as assignee of respondent Ocean Trading Corporation.

The payment represented prepaid freight charges for transportation of a cargo of sugar from Cuba to Japan under a voyage charter party between libelant and Ocean Trading Corporation as time chartered owner of the s/s Aspromonte. Marine Midland concedes that the freight money was not due to Ocean Trading since Ocean failed to perform its obligations under the time

charter; nonetheless it resists repayment to the libelant upon the ground that the money was paid voluntarily with knowledge that it was not due. I am satisfied that the libelant is entitled to the return of the payment, first upon the ground that it was made under a mistake of fact, and second because it was subject to a condition which was never satisfied.

The facts are these: On January 11, 1958 Ocean Trading Corporation time chartered the s/s Aspromonte for a period of twelve to fourteen months from the vessel's owners, hereinafter called "Garibaldi." Thereafter on January 22, 1958 Ocean Trading and libelant entered into a voyage charter party under which Ocean Trading was to transport from Cuba to Japan a cargo of sugar which libelant had purchased in Cuba and resold to a Japanese consignee. This charter party specified a rate per ton for the carriage of the sugar and further provided:

"All freight to be prepaid in New York in U. S. Currency on telegraphic advice of signing bills of lading on net bill of lading weight, * * *.

\* \* \* \* \* \*

"Mate's receipts to be signed for each parcel of Sugar when on board, and Captain to sign Bills of Lading in accordance therewith, as requested by Shippers."

On January 29, 1958 Ocean Trading assigned to Marine Midland all freight moneys due or to become due under the voyage charter of the s/s Aspromonte as collateral for loans to finance Ocean's charter operations.

The cargo of sugar destined for delivery to libelant's purchaser at a port in Japan was to be loaded at Jucaro, Cuba. Libelant sold the goods by documents and was to receive payment from its Japanese customer upon presentation of the bills of lading to bankers in England.[1] Loading of the sugar aboard the s/s Aspromonte at Jucaro, Cuba commenced on March 7, 1958 and was completed at two o'clock on March 24th. Some time after the completion of the loading, a representative of Atlantica del Golfo (from whom libelant had purchased the sugar) telephoned from Cuba to Roger A. Coe, libelant's representative here in New York City, advising him to that effect and giving him data upon which to compute the freight charges payable under the charter. Libelant's practice was to check the freight charges upon receipt of such informal advice and on the basis thereof to make payment to the shipper's representative; it did not await formal telegraphic advice that the bills of lading had been signed by the ship's master as specified in the charter.

Under common practice and usage of the trade, the mate's receipts are tallied against cargo as it is delivered to the vessel and, as soon as the last of the cargo is received aboard, the bills of lading as prepared by the shipper are checked against the mate's receipts, following which the master signs the bills of lading as a matter of routine. This procedure usually took from two to three hours. Coe testified that in all his experience he knew of no instance where a master had refused to sign the bills of lading in accordance with mate's receipts showing delivery of cargo to a vessel by the shipper.

It was against this background that the payment here in question was made by libelant on the morning after it had been advised that the last of the cargo had been loaded. Libelant delivered to the respondent Marine Midland its check payable to "S/S Aspromonte and/or Owners and/or Agents and/or Operators," together with a letter as follows:

"We are enclosing our check in the amount of $84,247.56 covering ocean freight on shipment of raw sugar on S/S Aspromonte in accordance with the above Charter Party. Please instruct your Havana Agents

---

1. Sale by shipping documents was usual in the sugar industry.

to release the bills of lading to our affiliated company, Compania Azucarera Atlantica del Golfo, Havana, Cuba."

The check and letter were delivered at 12:40 P. M. on March 25th to William Gebhardt, then Marine Midland's Assistant Treasurer, who was in charge of the Ocean Trading account. Early that afternoon Coe, who had telephoned Atlantica del Golfo in Havana to inquire as to the departure time of the s/s Aspromonte from Jucaro, Cuba to Japan, learned for the first time that the ship's master, upon presentation of the bills of lading, had refused to signed them. The evidence establishes that when delivery of the cargo to the vessel was finally completed on March 24th, the bills of lading were presented to the master for his signature and, although he found them correct, he did not sign them under direct instructions of the shipowner, Garibaldi. The assigned reason for this was that Ocean Trading had been in default in the payment of charter hire.

When Coe learned of the master's refusal to sign the bills of lading, he promptly called Gebhardt. This was shortly after the latter had received libelant's check. Gebhardt then advised Coe that he was in touch with Ocean Trading and that matters would be worked out.

Gebhardt, who also testified upon the trial, was a less than frank witness. Many of his answers were either evasive or he failed of recollection on the material matters as to which Coe had testified specifically. His actions in connection with the transaction show a deliberate purpose to hold on to the freight payment. When Gebhardt received the check from libelant, he had already been put on notice on two separate occasions, March 20th and 21st, that the ship's owner had threatened to refuse to permit the master to sign the bills of lading unless Ocean's default in the payment of charter hire and port charges was cured.[2]

In any event the evidence is convincing that in the early afternoon of March 25th he was advised by Coe of the master's refusal to sign the bills of lading. Thereupon Gebhardt, then aware that the freight money was not due, caused libelant's check to be certified, notwithstanding that there was no question of libelant's financial responsibility. The certification was admittedly obtained after discussions among Marine Midland's officers regarding the possibility of libelant stopping payment on the check. And when Coe made a further effort to reach Gebhardt that afternoon, the latter made himself unavailable. Coe, obviously concerned about the payment, continued thereafter his attempts to reach Gebhardt, but without success.

On March 28th additional charter hire was due from Ocean to Garibaldi which was not paid. This default was suffered when Marine Midland refused to advance additional funds to Ocean. Thereupon Garibaldi, because of this default, withdrew the Aspromonte from the service of Ocean and demanded that libelant immediately discharge the sugar cargo from the vessel or make new arrangements directly with Garibaldi for its carriage to Japan. Since Ocean was in no position to perform its carriage contract, libelant was compelled to come to terms with Garibaldi.

Gebhardt was fully aware that his action on behalf of Marine Midland in refusing further to finance Ocean would cause it to default and in consequence that Ocean would not be in a position to carry out its obligation to libelant to transport the sugar cargo. As early as March 10th Gebhardt, following an examination of the books of Ocean Trading, knew its financial situation was so "shaky," as he phrased it, that it could not then meet its obligations on the time charter parties which it held. Yet, on March 13th, during the progress of the loading of libelant's sugar cargo, he advanced to Ocean an additional sum of $11,421.88 to cover charter hire due for

2. Ocean Trading had another vessel, the s/s Nazareno, also under a time charter with Garibaldi.

the second half of the month; the loan was made to avoid possible withdrawal of the vessel from Ocean's service, which had been threatened by the vessel's owners. Obviously, had this occurred, libelant's cargo would not have been accepted and no moneys for freight would have been due Ocean.

It is unquestioned that since the bills of lading were never signed, the freight moneys were never due and payable to Ocean Trading, Marine Midland's assignor.[3] Marine Midland resists repayment on the ground that Coe, in prepaying the freight charges, was aware that the bills of lading had not been signed and hence there was no mistake of a present or pre-existing fact. However, it was a fact that Garibaldi had already issued an order to the vessel's master that the bills were not to be signed; it was a fact that the master had actually refused to sign them. Libelant had no knowledge or reason to know of either of these pre-existing facts; it is evident that libelant would not have paid the freight had it known of one or the other. Whether or not the bills had yet been signed, libelant paid the freight under an assumption that there was no existing impediment to completion of the usual procedure in the trade—that the bills of lading would be signed as a routine matter within hours after checking against the mate's receipts. It was unaware that the customary procedure already had been interrupted by the order of the vessel's owners and the refusal the day before by the master to sign the bills.

Respondent relies on Kaufman v. William Iselin & Co.,[4] and McMullen Leavens Co. v. L. I. Van Buskirk Co.,[5] the latter of which holds that, since an assignee does not assume the duties imposed upon the assignor,[6] he will not be compelled to repay the purchase price of the goods when the purchaser rescinds because the goods are defective. However, in Langel v. Betz,[7] upon which the foregoing cases rest, the New York Court of Appeals acknowledged that its ruling was contrary to the Restatement of Contracts, section 164(2), which the Court conceded was "perhaps, more in harmony with modern ideas of contractual relations * * *."[8] Accordingly, where, as here, recovery is not based upon contract, but rests upon equitable principles of restitution brought into play by a mistake of fact, there is no justification for extending the scope of Langel v. Betz and its progeny.[9]

Marine Midland, which had full knowledge that the freight payment was not due, if required to make restitution to libelant, will be in no worse position than that in which it would have been had libelant awaited the formality of telegraphic advice that the bills of lading had been signed. Upon all the facts here presented, on the ground of mistake of fact alone libelant is entitled to return of the money.

 Libelant is also entitled to the return of the prepaid freight charges upon another theory—the failure to perform a condition subject to which the payment was made—the release of the bills of lading and their delivery to libelant or its representative.

When libelant paid the freight charges to Marine Midland its check was accompanied by a letter which contained the following statement:

"Please instruct your Havana Agents to release the bills of lading

3. Ocean S. S. Co. v. United States Steel Prods. Co., 239 F. 823 (2d Cir.), cert. denied, 244 U.S. 652, 37 S.Ct. 650, 61 L.Ed. 1373 (1917).

4. 272 App.Div. 578, 74 N.Y.S.2d 23 (1947).

5. 275 App.Div. 701, 87 N.Y.S.2d 355, certified question affirmed, 299 N.Y. 784, 87 N.E.2d 682 (1949).

6. Langel v. Betz, 250 N.Y. 159, 164 N.E. 890 (1928).

7. Ibid.

8. 250 N.Y. at 163, 164 N.E. at 892.

9. See Lawrence v. American Nat. Bank, 54 N.Y. 432 (1873). Cf. Restatement of Restitution §§ 6, 18 (1936).

to our affiliated company * * *
Atlantica del Golfo, Havana, Cuba."

The respondent Marine Midland challenges that this attached any condition to the retention by it of the freight payment. True, it does not contain a precise legal definition of a condition, but it is clear under all the circumstances this was a businessman's expression that the payment was conditioned upon his receiving in return what he was supposed to get—the signed bills of lading. Otherwise there is no meaning or purpose to the letter. Gebhardt's statement that he assumed Ocean Trading's representative in Cuba had possession of properly executed bills of lading and that the letter only required him to notify Ocean to release the bills of lading is not only unpersuasive, but quite unbelievable. It flies in the face of the fact that payment of the freight charges was made by libelant to discharge its obligation under the voyage charter in return for which it was to receive the bills of lading, which it required in order to obtain payment from its buyer. As Judge Cardozo said: [10]

> "They [letters from one merchant to another] are to be read as business men would read them, and only as a last resort are to be thrown out altogether as meaningless futilities. * * * In the transactions of business life, sanity of end and aim is at least a presumption * * *."

The libelant, in addition to a decree in its favor against Marine Midland, is also entitled to a decree pro confesso against Ocean Trading.

The foregoing shall constitute the Court's Findings of Fact and Conclusions of Law. Either party may propose within five days from the date hereof additional findings upon three days' notice to the other side.

10. Outlet Embroidery Co. v. Derwent Mills, Ltd., 254 N.Y. 179, 183, 172 N.E. 462, 463, 70 A.L.R. 1440 (1930).